Diamond Bros. Company v. Commissioner.
Diamond Bros. Co. v. Commissioner
Docket No. 87004.
United States Tax Court
T.C. Memo 1962-132; 1962 Tax Ct. Memo LEXIS 176; 21 T.C.M. (CCH) 696; T.C.M. (RIA) 62132; May 31, 1962
*176 1. Unsecured, noninterest-bearing advances made by petitioner on open account to a corporation, 50 percent of whose stock it had recently acquired for no tangible consideration, held to be contributions of capital rather than loans. Bad debt deduction denied. 2. Petitioner held entitled to deduct the full amount of a reasonable charge to its bad debt reserve resulting from payment to bank of another corporation's liabilities to bank under a guarantee agreement executed by petitioner. Petitioner had agreed with three individual coguarantors, who had become such at petitioner's request, not to hold them liable for any loss suffered by petitioner as a result of the guarantee, so petitioner not required to reduce its chargeoff by contributions it may otherwise have been entitled to from coguarantors. Meyer Weiner, CPA, 130 N. Eighth St., Reading, Pa., for the petitioner. Albert Squire, Esq., and Dennis C. DeBerry, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in income tax due from petitioner for the taxable year ended June 30, 1955, in the amount of $60,978.27. The issues for decision *177 are: (1) Whether petitioner is entitled to a bad debt deduction in the taxable year 1955 in the amount of $100,079.75, representing advances to Park Lane Furniture Mfg., Inc., a corporation in which petitioner was a 50 percent stockholder; and (2) whether petitioner is entitled to deduct, as an addition to its reserve for bad debts in the taxable year 1955, the amount of $19,390.75, representing a portion of the payments which petitioner made to Camden Trust Company in the taxable year 1955 under an agreement termed "General Unconditional Guarantee," executed in favor of Camden Trust Company by petitioner. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation, organized under the laws of the State of New Jersey, with its present principal place of business in Reading, Pennsylvania. During the taxable year ended June 30, 1955, petitioner's principal place of business was Trenton, New Jersey. In 1953, one-third of its issued and outstanding stock was owned by Sol Diamond and one-third was owned by Joseph Diamond (hereafter referred to as Joseph). Its business was the manufacture and sale of upholstered living-room furniture. *178 Petitioner kept its books and prepared its income tax returns on the basis of a fiscal year ended June 30 and on an accrual method of accounting. References herein to the taxable year 1955 shall mean the fiscal year ended June 30, 1955. Petitioner filed its Federal income tax return for the taxable year 1955 with the district director of internal revenue, Camden, New Jersey. In 1953, Sol Diamond (hereafter referred to as Sol), who was a stockholder, a director, and the vice president of petitioner, was approached by Sigmund Berkowitz (hereafter referred to as Sigmund) at a convention. Sigmund told Sol that he - Sigmund - and his associates, who together owned the stock of Imperial Mills, Inc. (hereafter referred to as Imperial), a textile manufacturing company, and of Park Lane Furniture Mfg., Inc. (hereafter referred to as Park Lane), an upholstering and furniture manufacturing company, had agreed to separate. Sigmund was to have all the stock of one company; the associates were to have all the stock of the other company. Sigmund was then chairman of the board of Park Lane, but he had not actually been directing the company, and although he wanted to remain in the upholstering *179 and furniture manufacturing business, he lacked experience and knowledge. Sigmund explained that he needed assistance in setting up a better sales organization and in cost and production management. He asked Sol if he would be interested in expanding petitioner, and he offered petitioner 50 percent of the stock of Park Lane in exchange for petitioner's know-how. Sigmund could acquire all of the stock of Park Lane by an exchange of his wife's stock in Imperial for his associates' stock in Park Lane. However, the connection of Park Lane with banks in California had been handled by Sigmund's associates, not by Sigmund; their financial standing was considerably better than Sigmund's. Therefore, Sigmund was interested in obtaining financing for Park Lane, and he asked Sol if petitioner had a banking connection by which working capital for Park Lane could be obtained. Sigmund did not discuss with Sol borrowing money from petitioner. Sol went to Camden Trust Company (hereafter referred to as Camden Trust), Camden, New Jersey, and worked out an arrangement by which Camden Trust would loan money to Park Lane, with Park Lane's receivables as security, on the condition that Park Lane's books *180 would be kept in Trenton where they would be subject to audit by Camden Trust, and on the further condition that petitioner would "stand in back" of Park Lane. Petitioner agreed to these conditions, and Sidney Gushen, treasurer of petitioner, made sevaral trips to California to complete the final negotiations. On August 13, 1953, petitioner, Sigmund, Park Lane, Harry Strasberg, Stanley Strasberg, and Norma Berkowitz, Sigmund's wife, executed an agreement providing for the exchange of Norma's stock in Imperial for the Strasberg's stock in Park Lane. Norma was to give up her stock in Imperial; Sigmund was to receive the Strasbergs' stock in Park Lane. The Strasbergs were to deliver to Sigmund and Park Lane releases of any claims which they might have against Park Lane, and Sigmund and Norma were to deliver similar releases with regard to Imperial. Sigmund was to become the owner of all 250 issued and outstanding shares of stock of Park Lane by virtue of the exchange, and he was to surrender his certificate for such shares to Park Lane with instructions that a certificate for 125 shares of Park Lane stock be issued to him and a certificate for a like number of shares be issued to *181 petitioner. The Strasbergs were guarantors on bank loans to Park Lane, and Sigmund and petitioner were to obtain their release from such contingent liabilities. Also, the Strasbergs, by virtue of written guarantees or oral assurances, were contingently liable on certain accounts payable of Park Lane in the approximate amount of $20,000, and petitioner was to guarantee payment of these accounts within 10 days. Park Lane was to deliver its note payable 30 days after date in the amount of $9,500 to Harry, and petitioner and Sigmund were to guarantee payment thereof. Park Lane was also to deliver an additional note for $5,000 to Harry, payment of which was to be guaranteed by petitioner. In the agreement, reference was made to certain accounts receivable of Imperial in the approximate amount of $20,000. Sigmund was to indemnify Imperial for any losses resulting from these accounts, to the extent of 50 percent of the losses or $5,000, whichever was less. Petitioner was to guarantee Sigmund's indemnity obligations in this regard. Concurrently with the foregoing agreement, petitioner, Sigmund, and Park Lane entered into an agreement providing that petitioner was to receive 125 shares *182 of Park Lane stock in consideration for its entering into the contract with the Strasbergs and that petitioner was to be the owner of such shares without any further consideration from petitioner. Also, petitioner and Sigmund agreed that so long as they held the stock of Park Lane, they were to elect Sigmund as president and a director and Sol (or some other person designated by petitioner) as vice president and a director of Park Lane, and that signatures for bank accounts and for instruments for the payment of money on behalf of Park Lane were to be either Sigmund's or Sol's with respect to payroll and petty cash accounts maintained in California, but that the signature for all other accounts, "which shall be maintained in such bank accounts in the east" as petitioner would designate, was to be Sol's, although all purchase invoices were to be first approved by Sigmund. It was further provided that when "any bank or banks in Los Angeles County can meet all [Park Lane's] financial requirements, bank accounts referred to in this subdivision * * * shall be opened in Los Angeles County." Sigmund was to be general manager of Park Lane at a weekly salary of $150 plus expenses; no other *183 officer or director of Park Lane was to receive a salary except as a regular employee. The treasurer of petitioner was to be secretary-treasurer of Park Lane. Petitioner and Sigmund were each to have rights of first refusal in the event either desired to sell its or his shares. Park Lane was to be named beneficiary of a life insurance policy in the amount of $50,000 on Sigmund's life; Park Lane was to pay the premiums on, and be assignee of, the policy. The proceeds of the policy were to be used by Park Lane to purchase Sigmund's stock, in the event of his death, at its "fixed value," for which provision was made in the agreement. If insurance could not be obtained on Sigmund, upon his death Park Lane, or if it was unable to do so, petitioner, was given the right to purchase Sigmund's stock at its "fixed value." Payroll and petty cash records of Park Lane were to be kept in California at the business offices of Park Lane; copies of such records were to be sent to petitioner's offices in Trenton, New Jersey. All other books, records, and documents of Park Lane were to be kept at petitioner's offices in Trenton. The two agreements of August 13, 1953, were based upon an audit of Park *184 Lane's books and records as of June 30, 1953, and upon a pro-forma balance sheet of Park Lane as of June 30, 1953, which was exactly the same as the balance sheet prepared from the audit, except that effect was given to transactions by which the land and building were sold at book value of $82,150; a trust deed in the amount of $43,370.65 was paid; the remainder of the proceeds in the amount of $38,779.35, representing Park Lane's equity in the land and building, was applied on accounts payable; and the amount of $37,936.49, representing notes payable to officers and stockholders, was transferred to capital surplus. This pro-forma balance sheet for Park Lane as of June 30, 1953, after giving effect to the foregoing transactions, was as follows: ASSETS
CURRENT ASSETS
Cash on hand
$ 100.00
Accounts receivable -
Pledged (see contra)
$ 89,459.40
Free
93,389.87
182,849.27
Less: Furniture at marts
3,548.78
179,300.49
Less: Reserve for bad debts
3,335.08
175,965.41
Merchandise inventory - at marts (cost)
3,548.78
Merchandise inventory
103,391.31
Loans and exchanges
400.00
TOTAL CURRENT ASSETS
$283,405.50
Reserve For
FIXED ASSETS
Cost
Depreciation
Net
Machinery and equipment
$11,508.26
3,147.05
8,361.21
Furniture and fixtures
3,588.99
1,157.27
2,431.72
Automobile
2,780.89
86.90
2,693.99
TOTAL FIXED ASSETS
17,878.14
4,391.22
13,486.92
OTHER ASSETS
Prepaid expenses
$ 5,787.29
Deposits
228.03
Loans and exchanges
3,002.13
Organization expenses
150.00
TOTAL OTHER ASSETS
$ 9,167.45
TOTAL ASSETS
$306,059.87
LIABILITIES AND CAPITAL
CURRENT LIABILITIES
Bank overdraft
$ 4,272.85
Accounts payable
113,166.06
Loan payable (see contra)
67,094.56
Accrued expenses
13,653.55
Sales commissions payable
3,275.78
Payroll taxes payable
17,034.69
Sales taxes payable
46.79
Hawaii compensating tax
8.61
Employees' insurance payable
2,217.49
Loans and exchanges
23.00
Trade acceptances payable
19,889.61
Notes payable - officers and stockholders
450.91
TOTAL CURRENT LIABILITIES
$241,133.90
CAPITAL
Capital stock - authorized and issued
$ 25,000.00
Deficit - July 1, 1952
($ 30,109.88)
Add: Net profit for fiscal year
ending June 30, 1953
32,099.36
Capital surplus
37,936.49
39,925.97
TOTAL CAPITAL
$ 64,925.97
TOTAL LIABILITIES AND CAPITAL
$306,059.87
*185 Sol realized that Park Lane needed working capital. Park Lane made considerable purchases two times during the year and required money to pay its borrowing incurred in building up its inventory. After petitioner acquired its stockholdings in Park Lane, the volume of business done by that company increased. Beginning in October 1953, petitioner advanced funds to Park Lane in the amounts and in the months set forth below: 1953
October
$ 60,000.00
December
10,000.00
1954
January
7,486.21
February
40,320.15
March
1,872.00
April
1,590.00
May
23,095.00
June
12,529.46
August
4,500.00
September
362.50
October
2,085.00
November
1,105.07
December
553.41
1955
January
$ 800.00
April
500.00
May
900.00
June
400.00
Total
$168,098.80
The foregoing advances were charged on petitioner's books to an account entitled "Loans Receivable - Park Lane." Repayments and credits were received by petitioner from Park Lane and were credited to the above account in the amounts and in the months shown below: 1954
January
$ 4.50
February
381.50
April
67,420.36
May
11,000.00
June
3,146.65
August
5,500.00
October
762.50
November
203.54
December
600.00
Total
$89,019.05
*186 In addition to the advances set forth above charged to "Loans Receivable - Park Lane," petitioner advanced $25,000 to Park Lane on August 8, 1954, which amount was charged on petitioner's books to an account entitled "Park Lane - Misc." No notes, written obligations, or other evidence of indebtedness were executed by Park Lane, no definite repayment dates were set, and no interest was charged or paid with respect to and of these advances from petitioner to Park Lane. On November 11, 1953, petitioner executed a general unconditional guarantee, by which it guaranteed to Camden Trust that Park Lane would pay to Camden Trust all its liabilities when they became due or when Camden Trust demanded payment. In this guarantee it was recited that petitioner was a substantial stockholder and was financially interested in the affairs of Park Lane. Petitioner's liability under the guarantee was not to exceed $300,000. Also on November 11, 1953, Sol, Joseph, and Sigmund executed a similar general unconditional guarantee in favor of Camden Trust by which they jointly and severally, guaranteed payment to Camden Trust of all of Park Lane's liabilities to Camden Trust. Their liability under this *187 guarantee was limited to $300,000. When the guarantees were executed Camden Trust had financial statements for petitioner and for Park Lane, but it did not have such statements for Sol, Joseph, or Sigmund. The officer of Camden Trust who handled the matter had no personal knowledge of the financial reliability or rating of the individuals. In dealing with closely held corporate guarantors, it was routine procedure for Camden Trust to require written guarantees from the officers or other interested individuals without evidence of the financial responsibility of such individuals, primarily to assure their continuing interest in the corporation and looking after its affairs; and this was the reason Camden Trust required the guarantees of Sol, Joseph, and Sigmund. Camden Trust would not have loaned money to Park Lane, even with its accounts receivable as collateral and even with petitioner's guarantee, without the guarantee of Sol, Joseph, and Sigmund. After the individuals executed the guarantee, Camden Trust obtained financial statements for Sol, Joseph, and Sigmund. Petitioner's board of directors met to consider the guarantee which petitioner was to execute in favor of Camden Trust. *188 Sol, Joseph, Albert Diamond, Sidney Gushen, and Fred Sherman were present at this meeting. They discussed the requirements that petitioner execute the unconditional guarantee and that the bank also required that Sol, Joseph, and Sigmund execute an additional guarantee. It was decided by the directors at the meeting that being a stockholder and financially interested in Park Lane, it would be beneficial to petitioner for Park Lane to obtain the line of credit, that petitioner should execute the guarantee agreement, and if there was any loss to petitioner under the guarantee, petitioner would not hold either Sol or Joseph or Sigmund liable on their guarantee. This decision was recorded in the minutes of that meeting of the board of directors, but these minutes had been inadvertently lost and were not available at the time of the hearing of this proceeding. The individual guarantors gave petitioner no money or property for this decision of the directors. From time to time after it acquired stock in Park Lane, petitioner guaranteed payment of Park Lane's purchases from various suppliers and its accounts payable. For the period July 1, 1953, to March 31, 1954, Park Lane had net sales *189 in the amount of $1,611,087.39, gross profit of $390,394.89, and net profit on operations of $31,114.91. However, it incurred financial management expenses (consisting largely of sales discounts, interest, bank charges, and bad debts) in the total amount of $59,623.11, and the resulting net loss for the period was $28,508.20. The balance sheet of Park Lane as of March 31, 1954, was as follows: ASSETS
CURRENT ASSETS
Cash overdraft -
Camden Trust Co.
($ 99,177.03)
Union Bank
(3,263.07)
Cash - Union Bank - payroll
7,148.86
Petty cash
200.00
Net cash overdraft
($ 95,091.24)
CURRENT ASSETS - Continued
Accounts receivable
$447,069.31
Less: Reserves - losses
13,142.20
Net accounts receivable
$433,927.11
Loans and exchanges
119.50
Inventories
179,859.92
NET CURRENT ASSETS
$518,815.29
FIXED ASSETS
Cost
Depreciation
Balance
Buildings
$ 84,600.00
$2,216.67
$ 82,383.33
Machinery
11,577.26
3,917.48
7,659.78
Office fixtures
4,200.89
1,427.79
2,773.10
Automobile
2,780.89
550.42
2,230.47
$103,159.04
$8,112.36
$ 95,046.68
Land
12,500.00
TOTAL FIXED ASSETS
$107,546.68
MISCELLANEOUS ASSETS
Loans to officers
$ 2,900.00
Prepaid insurance
5,675.62
Organization expense
150.00
TOTAL MISCELLANEOUS ASSETS
$ 8,725.62
TOTAL ASSETS
$635,087.59
LIABILITIES
CURRENT LIABILITIES
Accounts payable
$ 75,845.21
Notes payable - trade
6,635.10
Trade acceptances
36,416.31
Accrued expenses
30,001.34
Payroll taxes
25,007.20
Vacation pay reserve
7,500.00
Payroll accrued
20,645.78
Notes
$300,000.00
Less: Cash - special account
58,560.84
Net notes payable - Camden Trust
241,439.16
Loans payable - Diamond Bros. of Ill.
14,009.47
Loans payable - Diamond Bros. Co.
102,172.00
Trust deeds (current)
21,102.00
TOTAL CURRENT LIABILITIES
$592,773.57
LONG-TERM LIABILITIES
Trust deeds payable after 1 year
18,997.84
TOTAL LIABILITIES
$601,771.41
CAPITAL
Capital
$ 25,000.00
Capital and surplus
28,387.40
$ 63,387.40
Deficit
(30,071.12)
Net capital
$ 33,316.18
TOTAL LIABILITIES AND CAPITAL
$635,087.59
*190 The accounts receivable shown on the foregoing balance sheet were pledged and assigned to Camden Trust as security for Park Lane's loans. At the beginning of 1954, Park Lane had two plants in California. It owned one and leased the other. Petitioner permitted Park Lane to sell its products under petitioner's name. Prior to the acquisition by petitioner of 50 percent of the stock of Park Lane, merchandise shipments of that company never exceeded $85,000; in November 1953 its shipments exceeded $230,000. On November 9, 1954, Camden Trust called upon petitioner to make good its guarantee of Park Lane's obligations. Accordingly, petitioner paid Camden Trust $83,542.24, which amount was charged on petitioner's books to an account entitled "Park Lane Accounts Receivable." Petitioner received from Camden Trust Park Lane's note payable to, and endorsed by, Camden Trust and also received accounts receivable belonging to Park Lane in the amount of $148,222.25, which Camden Trust had been holding as security. Petitioner collected a net amount of $19,230.08 on these accounts receivable by June 30, 1955, leaving a balance of $64,312.16 still due from Park Lane by reason of petitioner's payment *191 under the guarantee. Of this amount, after Sol and petitioner's independent accountant reviewed the collectibility of Park Lane's accounts receivable, petitioner charged $25,854.33 to its "Reserve for Doubtful Accounts" on June 30, 1955. Neither Sol, nor Joseph, nor Sigmund (who died before the hearing of this proceeding), nor Sigmund's estate has been called upon to make any payments by reason of their guarantee of Park Lane's obligations. Also on June 30, 1955, petitioner charged the following amounts to its "Bad Debts" account: (1) $75,079.75 of the balance of the account "Loans Receivable - Park Lane" (the remaining balance of $4,000 in this account was not charged to its "Bad Debts" account); (2) $25,000, representing the balance in the account "Park Lane - Misc." On November 16, 1954, Park Lane filed a voluntary petition under chapter XI of the National Bankruptcy Act. Respondent determined that: The bad debt deduction of $100,079.75, resulting from write-off of Park Lane loan account of $75,079.75 and Park Lane miscellaneous account of $25,000.00 is disallowed. The balance in the above accounts are considered to be capital investments in Park Lane Manufacturing Company, *192 Inc. The amount of $7,122.78 constitutes a reasonable addition to the reserve for bad debts for the taxable year ended June 30, 1955. Accordingly, in addition to the $100,079.75 disallowed as explained above, the bad debt deduction is further disallowed to the extent of $19,390.75. This $19,390.75 represents an erroneous charge against the reserve for bad debts for that portion of payments made to Camden Trust Company by Diamond Bros. Company as guarantor of loans of Park Lane Manufacturing Company, Inc. which was collectible at June 30, 1955 from co-guarantors of said loans. Ultimate Findings Advances by petitioner to Park Lane constituted, as a matter of substantial economic reality, investments of equity capital, put at the risk of the business of Park Lane, and did not constitute bona fide debts, the repayment of which was anticipated by petitioner regardless of Park Lane's earnings. The amount of $25,854.33 charged by petitioner to its "Reserve for Doubtful Accounts" on June 30, 1955, was a reasonable addition to petitioner's reserve for bad debts for its taxable year ended June 30, 1955. Opinion Both issues in this case stem from petitioner's interest in Park Lane. *193 The first issue is concerned with advances which petitioner made to Park Lane from October 1953 through June 1955. At the end of petitioner's taxable year 1955, the net amount of these advances was $100,079.75, and petitioner in that year wrote off this amount on its books and claimed the amount as a bad debt deduction on its return. Respondent determined that petitioner was not entitled to a bad debt deduction for the amount of the net advances made to Park Lane because the advances were not debts but were capital investments in Park Lane by petitioner. Respondent does not question the fact that if the advances were debts they became worthless in petitioner's taxable year 1955. Whether advances by a taxpayer to a corporation in which he is a stockholder constitute investment of equity capital or loans for tax purposes is a question of fact. (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied ; *194 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court, certiorari denied ; ; , affirmed per curiam (C.A. 9, 1950), certiorari denied . No matter in what context the problem is presented, the basic question is whether the advances, as a matter of economic reality, have been put at the risk of the corporate venture and thus constitute an equity investment, or whether they have been advanced with the genuine and reasonable expectation that they will be repaid in all events and regardless of the earning of profits by the corporation and are thus a valid indebtedness. See . As aptly stated in (C.A. 7, 1942), reversing, : the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event. *195 The burden of proving that the advances to Park Lane constituted a valid indebtedness is upon petitioner. ; (C.A. 2, 1952), affirming, . Since each case must turn on its own facts, an extended review of the many cases in which the issue has been presented is unwarranted. It is sufficient to note that of the factors deemed relevant in the resolution of the problem, courts have stressed the following: The intention of the parties; the debt-equity ratio of the corporation when the advances were made; the bookkeeping entries of the parties; whether the stockholder making the advances has taken the usual steps to assure himself of ordinary creditor status and safeguards - whether the advances are evidenced by notes or bonds, bear interest, are secured, and are not subordinated to other creditors; whether the funds advanced could have been obtained from sources other *196 than the stockholder; whether the advances carry with them those rights of control over the corporation usually vested only in stockholders; whether stockholder advances have been made in approximate proportion to the stockholdings; whether there has been repayment of the advances; the purposes for which the advanced fund has been used; and the possibility of tax avoidance motives. The intention of the parties is often difficult to discern; usually it must be gleaned from a study of the entire record and often the parties have no definite intention as to tax consequences. See In the present case, the parties' intentions with respect to the advances must be viewed against the factual background, which may fairly be summarized as follows: In 1953 petitioner was expanding its business of manufacturing and upholstering furniture. It was already serving the northeast United States from its Trenton plant, and in order to expand in the Chicago area it purchased a furniture-manufacturing plant at Coal City, Illinois, and organized a wholly owned subsidiary, Diamond Bros. Company of Illinois, to hold title to the *197 plant. Also in 1953 Sigmund approached Sol with a proposition for petitioner to become the owner of 50 percent of the outstanding stock of Park Lane, which was in the furniture upholstering and manufacturing business in California. Sigmund, who together with Norma and the Strasbergs owned the stock of Park Lane and Imperial, was to acquire all the stock of Park Lane in exchange for Norma's stock in Imperial. Once this exchange was effected, Sigmund was to give petitioner 50 percent of the stock of Park Lane. It does not appear that Sigmund offered to sell petitioner 50 percent of the stock of Park Lane. Also, it seems clear that Sigmund did not request a loan for Park Lane when he approached Sol. Sigmund wanted the stock of Park Lane rather than that of Imperial, although he was not experienced in operating a furniture manufacturing and upholstering business, but Sigmund was handicapped not only by his lack of knowledge and experience but also by an individual credit rating that was inadequate to support Park Lane's financing. We think the record amply demonstrates the financial weakness of Park Lane. Sigmund told Sol as much when he first approached him. Sigmund's first concern *198 was whether petitioner had a "bank connection" which would serve as a supply of working capital. The Strasbergs had taken care of Park Lane's financing with a bank in California, Sigmund explained. By this, we think Sigmund meant that the Strasbergs, who had a good financial standing, guaranteed Park Lane's obligations to the bank, as petitioner was to do later. That the financial condition of Park Lane was bad is also borne out by Park Lane's balance sheet as of June 30, 1953. At that date Park Lane's current liabilities far exceeded current assets; there was a bank overdraft; almost half of its accounts receivable were pledged; total assets were shown at $388,209.87, although net worth was only $26,989.48; and loans payable to stockholders were shown at $38,387.40. Sometime before August 13, 1953, when petitioner and Sigmund entered into the agreement whereby petitioner received 50 percent of Park Lane's stock, a pro-forma balance sheet was prepared to reflect certain transactions and Park Lane's financial position was shown as improved. Park Lane's land and building were considered as having been sold at cost and the proceeds used to pay off a trust deed and certain accounts payable. *199 [1] In addition, loans payable to stockholders in the amount of $37,936.49 were transferred to capital surplus, thus increasing Park Lane's net worth. Still, current assets did not appreciably exceed current liabilities. As part of the transactions by which Sigmund, Norma, and the Strasbergs exchanged stock and by which petitioner acquired one-half of Park Lane's stock, petitioner agreed to secure release of the Strasbergs from their guarantees of loans to Park Lane and to pay off certain accounts payable on which the Strasbergs were contingently liable. In short, it can hardly be disputed that Park Lane desperately needed working capital when petitioner received its stock interest. We believe the parties anticipated that petitioner *200 would supply such capital. It is admitted that petitioner was expected to, and did, secure bank loans, and the only reasonable inference from the evidence is that petitioner, in August 1953, expected to make the advances which it subsequently made. In October 1953 petitioner advanced $60,000 and had advanced another $10,000 before the end of the calendar year. The balance sheet for Park Lane as of December 31, 1953, showed that current assets were still less than current liabilities. We further believe that the parties intended that the advances would be repaid only if Park Lane prospered, that the funds advanced were to be put at the risk of Park Lane's business, and that petitioner hoped primarily for an increase in the value of its stockholdings in Park Lane rather than for repayment. It is true that from the book entries the advances appear to be advances on open account with repayments from time to time, and the officers of petitioner referred to them as loans in their testimony. However, these officers failed to explain just how these advances were started, what they were used for, or what they thought petitioner's rights would be with respect to these advances in the event *201 of Park Lane's failure. We think it is likely that they did not actually give these things much thought at the time. They were interested in developing Park Lane as a west coast outlet or introduction into the west coast market and as Park Lane needed funds they were advanced by petitioner. While we consider it likely that as among themselves and Berkowitz, the other stockholder in Park Lane who died before the trial, they intended that in the event of liquidation of Park Lane petitioner would recover its advances before anything was paid on Park Lane's stock, we also believe from all the evidence that the individuals involved recognized that if Park Lane failed all other creditors of Park Lane would be paid first and that only if Park Lane was successful would petitioner be able to recover all of its advances. We do not think the advances under the circumstances here present qualify as a debt for income tax purposes, even though they were designated as loans, because in economic reality the money advanced was placed at the risk of the business in the same manner as would be equity capital and the only prospect for repayment was in the event Park Lane was operated at a profit. We do *202 not think such an arrangement creates a bona fide indebtedness repayable in any event, which we believe to be the least that the tax law requires. We note that from November 1954 through June 1955 petitioner advanced $4,258.48 to Park Lane, which filed its voluntary petition in bankruptcy in November 1954. It cannot be contended that these advances made to a presumably insolvent company were intended as an indebtedness to be repaid. See (C.A. 7, 1959). Furthermore, petitioner in all likelihood knew before November 1954 that Park Lane was failing; and advances after petitioner gained such knowledge would hardly have been intended to be anything but contributions to capital made in order to salvage prior investments. See The advances were made over a period of time and the debt-equity ratio of Park Lane varied during the period. Capital stock was carried on the balance sheet at $25,000. Giving effect to the transfer of loans payable to stockholders to capital surplus, the ratio of debt-to-equity at June 30, 1953, was roughly 5:1. [2] At September 30, 1953, it was about 7:1; at *203 December 31, 1953, about 15:1 (excluding petitioner's advances); and at March 31, 1954, about 14:1 (excluding petitioner's advances). [3] We find these ratios inconclusive, but the answer to the present issue is not to be found solely in the factor of debt-equity ratio. Cf. , aff'd (C.A. 6, 1956), certiorari denied , with . These ratios do serve to support the conclusion that Park Lane's financial position, particularly with regard to working capital, was weak when petitioner acquired its stock in Park Lane, and they tend to show that petitioner continued to advance Park Lane funds during a period when that financial position was worsening. *204 As for the bookkeeping entries of petitioner and Park Lane, a factor which we deem of slight significance in this case, both parties recorded the amount of the advances as debts from Park Lane to petitioner. [4]
It is quite clear that petitioner did not have the protection usually afforded a creditor. The "debts" owing to petitioner were not evidenced by notes; there is no showing that interest was ever accured or was intended to be accrued on them; they were unsecured. Furthermore, petitioner *205 assumed a position subordinate to Park Lane's other - and admittedly bona fide - creditors by guaranteeing the obligations to Camden Trust and the debts owing to certain of Park Lane's suppliers. In short, petitioner's conduct was never that of a creditor seeking assurance of unconditional repayment of a bona fide debt. Petitioner does not, and under the facts of this case cannot, argue that the funds advanced to Park Lane could have been obtained from other sources. Park Lane could not obtain bank loans in California without the guarantee of its obligations by the Strasbergs; it was because Sigmund could not obtain bank financing that he approached Sol in 1953. Without petitioner's guarantee, some suppliers would not extend short-term credit to Park Lane. The attitude of Camden Trust demonstrates that of a disinterested creditor - Park Lane could get financing only by pledging all of its accounts receivable and by maintaining its records where they were subject to audit at any time, and because petitioner, Sol, Joseph, and Sigmund unconditionally guaranteed repayment. Park Lane's borrowing capacity was strained to the limit, and petitioner in making the advances in question, went *206 beyond that limit. It made advances that no creditor, lacking an equity interest in Park Lane, would have made. The advances made by petitioner were not in such form as to carry with them control of Park Lane; we are not dealing with "hybrid securities," having the form of obligations but also having voting rights. However, it is to be noted that, as a practical matter, petitioner had control over Park Lane during the period of the advances. It held 50 percent of the stock, which Sigmund gave up, but by virtue of petitioner's agreement with Sigmund, petitioner had control over Park Lane's bank accounts (except the petty cash and payroll accounts in California), its bank borrowing, and even its books and records. In fact, petitioner's bookkeeper, who also kept the books of Park Lane, upon the instructions of Sol alone, advanced petitioner's funds to Park Lane when Park Lane needed them and reimbursed petitioner from Park Lane's funds whenever Park Lane had funds available, "after paying the bills, or the payroll, or whatever else had been paid." Furthermore, without the advances from petitioner, it does not appear that Park Lane could have remained a going concern; by simply cutting *207 off the advances and refusing to guarantee financing and credit, petitioner could probably have forced Park Lane out of business. These factors, coupled with 50-percent stock ownership and the agreement with Sigmund, equalled control. We recognize that the advances in this case were not in proportion to stockholdings; Sigmund, who owned the other 50 percent of Park Lane's stock, advanced no funds. Ordinarily, this fact would weigh more heavily than it does in this case. But here, petitioner paid nothing for its 125 shares when it acquired them. We recognize further that petitioner credited Park Lane's account on its books with certain amounts during the period that petitioner was making the advances. We are not advised whether these credits represented repayments in cash or whether they represented inventory transfers, work performed, or something other than cash payments. The stipulation does indicate, however, that advances were often made in the same months repayments were made. Generally, repayments butress the argument that advances constitute bona fide debts, but that factor is not *208 conclusive and must be considered with all the evidence. Cf. We can afford slight weight to it in the present case because, as noted above, the transfer of funds and credits between the two companies appears to have been entirely within the control of petitioner's officers. There is no evidence that petitioner was prompted by tax-avoidance motives to make advances in the form of open account loans rather than as capital contributions, but a taxpayer's motives bear largely only on the factor of the parties' intent, and we think the record fully supports the conclusion that petitioner, having paid nothing for its stock, put funds at the risk of Park Lane's business and could not reasonably have expected unconditional repayment. It was intended therefore, as a realistic matter, that the advances be equity capital and that the funds remain in Park Lane until such time as earnings and profits justified "repayment." No direct evidence was offered concerning petitioner's efforts, if any, to collect these advances in the Park Lane bankruptcy proceeding and we must assume that no such effort was made. In fact, *209 petitioner continued to advance funds to Park Lane after the bankruptcy petition was filed. We sustain respondent's determination on the first issue. The second issue is also concerned with a bad debt deduction. Petitioner, upon paying Camden Trust on its guarantee for Park Lane, received Park Lane's note in favor of Camden Trust together with Park Lane's accounts receivable which had been pledged with Camden Trust. Petitioner collected on some of these accounts receivable, and on June 30, 1955, there was still due to petitioner $64,312.16 by reason of the guarantee payment. Of this amount, petitioner charged the amount of $25,854.33 to its reserve for bad debts account. Respondent has determined that petitioner is entitled to add to its reserve for bad debts for the taxable year 1955 only the amount of $7,122.78 of the claimed addition of $26,513.53. [5] This determination is based on a finding that petitioner was only one of four guarantors of Park Lane's obligations and that its liability under the guarantee is limited to a pro-rata share of the obligation. Its loss, argues respondent, should be limited to this amount; any payments made by petitioner in excess of its share *210 are recoverable from the coguarantors, Sol, Joseph, and Sigmund. Respondent cites no direct authority for this proposition; but in any event, we do not think it is applicable under the facts of this case. Generally, petitioner, as one of four coobligors which had paid in full the common debt, could recover from the other guarantors, including Sigmund's estate, their pro-rata share of the obligation, under the equitable principle of contribution. See, for example, . This would be true despite the fact that petitioner received Park Lane's note and the accounts receivable which had been pledged as security for the debt to . Apparently, *211 the equitable doctrine of contribution among coobligors is well recognized in ; ; ; . But petitioner contends that it agreed with Joseph, Sol, and Sigmund that, in the event Park Lane did not discharge its obligations to Camden Trust, the individuals would suffer no loss by reason of the guarantee. Although such an agreement would have no effect on the guarantor's obligations to Camden Trust, coorligors can agree among themselves that one shall hold the other harmless and such an agreement will be given effect in an action for contribution. Here the evidence indicates that the individuals became guarantors at the behest of petitioner and for its benefit. That alone would not absolve them from liability for contribution as coguarantors, but it is good consideration for petitioner's *212 promise to hold them harmless, which may be viewed as a promise of indemnity which would protect them from contribution in an action therefor by the indemnitor. ; see ; ; . Here petitioner has proved that, in return for their agreement to guarantee Park Lane's debts, it agreed not to collect from the individual guarantors if it was forced to pay under its guarantee agreement. It would appear that this agreement could have been used by the individuals as a defense to any action by petitioner against them for contribution; and respondent has shown us nothing to convince us to the contrary. Consequently, we are not convinced that petitioner had any enforceable right of contribution from the individual guarantors even had it chosen to pursue it. Respondent has not questioned the insolvency of Park Lane, the principal debtor, nor has he argued that the amount charged off by petitioner in 1955 was excessive. Such being *213 the case petitioner is entitled to deduct the amount charged to its reserve as a bad debt for the year 1955. Respondent argues obliquely that petitioner, in paying the common debt, made a distribution to the individual. By this we suppose respondent means that the failure of petitioner to press for contribution from the individuals constitutes a payment made on their behalf and for their benefit and, therefore, a constructive dividend to them. The facts do not support such a theory. We hold for petitioner on this second issue. Decision will be entered under Rule 50. Footnotes
1. We doubt that the land and building were ever actually sold, although the pro-forma balance sheet, showing an improved financial situation, was prepared on the assumption that they would be sold. The book value of these assets (exclusive of depreciation reserve) was shown to be $82,500 on a balance sheet as of June 30, 1953. Land and building were carried at the same value at September 30, 1953. The parties adduced no evidence on the point.↩
2. No effect has been given to the supposed transaction. reflected in the pro-forma balance sheet of June 30, 1953, by which land and building were sold at book value. See footnote 1. ↩
3. The parties have stipulated that petitioner's advances to Park Lane to March 31, 1954, amounted to $119,678.36 and that repayments or credits to that date amounted to $386, leaving net advances in the amount of $119,292.36. However, the balance sheet for Park Lane as of March 31, 1954, shows loans payable to petitioner in the amount of $102,172, and to Diamond Bros. Company of Illinois in the amount of $14,009.47. The discrepancy is not explained, but it is possible that some advances to Park Lane were included in the accounts payable.↩
4. As we have noted, Park Lane's capital stock as shown on its balance sheets for the period of the advances remained constant at $25,000. There is a slight difference between "capital surplus" as shown at June 30, 1953, on the pro-forma balance sheet, and "Surplus Paid In" as shown on subsequent balance sheets, and the payables shown on Park Lane's balance sheets do not agree with the parties' stipulated amounts. See footnote 3. But if the advances were not shown on Park Lane's books as payables, they could only have been recorded as "Surplus Paid In," and, except for a small amount, this account consisted of amounts owed to stockholders before petitioner acquired its stock in Park Lane.↩
5. Respondent asserts on brief that petitioner deducted for the taxable year 1955 the amount of $25.854.33, which is actually the amount of this charge to the bad debt reserve. Petitioner actually deducted the addition to the reserve in the amount of $26,513.53, and respondent's determination in the statutory notice refers to the addition.↩